IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

MIJO IVANOVIC                    )
                                     )
          Plaintiff,         )   TC-MD 120142D
                                     )
       v.                    )
                                     )
CLACKAMAS COUNTY ASSESSOR,     )
                                     )
                                     )
          Defendant      )  **DECISION**

Plaintiff appeals the real market value of residential property identified as Account 01683093 (subject property) for the 2011-12 tax year. A trial was held in the Oregon Tax Court, Salem, Oregon on June 12, 2012. Steve Anderson (Anderson), a licensed real estate broker, appeared and testified on behalf of Plaintiff. Richard Valasek (Valasek), registered appraiser, testified on behalf of Defendant.

Plaintiff's Exhibits 1 through 8 and Defendant's Exhibits A through J were received without objection.

## I. STATEMENT OF FACTS

The subject property is a two story structure sited on a 17,690 square foot lot in Happy Valley, Oregon. (Def's Ex A at 5.) The subject property's structure is a single family house with 4,135 square feet of living space, split nearly equally between the first and second floors. (*Id*. at 4.) The house has an attached three-car garage with an additional 864 square feet of finished space above the garage.[1] (*Id.*) The house has four bedrooms, and three and a half baths. (Ptf's Ex 1 at 4.) The house was built in 2003 and sold twice prior to 2011. (Def's Ex A at 4; Ptf's Ex 1 at 1.)

---

[1] Plaintiff stated that the home is 5,186 square feet. (Ptf's Ex 1 at 1.) Defendant stated that the subject property has 4,999 feet of finished living space. (Def's Ex A at 5.)

Anderson testified that Plaintiff negotiated the sale of the subject property on October 18, 2010, and purchased the subject property from Citibank (the bank) on March 4, 2011 (purchase date), paying $420,000. (*See* Ptf's Ex 1 at 1; Def's Ex B at 1.) Anderson testified that the subject property was on the market from February 1, 2010, until the purchase date, and during that period of time, the listing price declined at regular intervals from an initial listing price of $649,900 to a final listing price of $426,800 on November 4, 2010. (*See* Ptf's Ex 2 at 1.) Anderson testified that the bank took possession of the subject property through foreclosure on June 10, 2010. (*See* Ptf's Ex 1 at 1.) Anderson testified that, in 2010, approximately 40 percent of the homes ranging in sales price from $400,000 to $1,000,000 were bank owned properties, and in 2011, over 30 percent of homes sold in the same price range were banked owned. (*See id.* at 2, Ptf's Ex 7 at 1.) Anderson testified that the bank put the subject property on the market at the final listing price on September 14, 2010, and that the subject property was on the market at that price for 51 days prior to Plaintiff's purchase. (*See* Ptf's Ex 2 at 1.)

Valasek determined a real market value for the subject property of $550,000, using the comparable sales approach. (Def's Ex A at 11.) He requested that the real market roll value of $550,000 be sustained. Valasek relied on sales data from six properties he identified as comparable to the subject property. (*Id.*) He testified that two of the six comparable sales were bank sales. Valasek testified that the average time on the market for properties similar to the subject property was 160 days in September 2010, and 163 days in February 2011. (*See* Def's Exs F at 2; G at 2.) He testified that the real market value for comparable properties was declining at an annual rate of four percent in 2010. (*See* Def's Ex A at 10.)

///

///

II. ANALYSIS

The issue before the court is the subject property's real market value as of January 1, 2011. In Oregon, all real property "not exempt from ad valorem property taxation or subject to special assessment shall be valued at 100 percent of its real market value." ORS 308.232.[2] ORS 308.205(1) defines real market value as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

A.      *Purchase price*

When determining real market value, a voluntary, arm's-length sale of a property between a willing and knowledgeable buyer and seller is "very persuasive" of real market value. *Kem v. Dept. of Rev.* (*Kem*), 267 Or 111, 114, 514 P2d 1335 (1973); *see also Sabin v. Dept. of Rev.*, 270 Or 422, 426-27, 528 P2d 69 (1974); *Equity Land Res. v. Dept. of Rev.*, 268 Or 410, 414-15, 521 P2d 324 (1974). The two important considerations are whether or not the sale was "recent" and whether it was "arm's-length." *Kem*, 267 Or at 114-15.

Plaintiff's purchase, which was negotiated on October 18, 2010, and closed on March 4, 2011, was close to the January 1, 2011, assessment date, making it a fairly recent sale. *See Brashynyk v. Lane County Assessor* (*Brashnyk*), TC-MD No 110308, WL 6182028 at *5 (Dec 12, 2011).

Therefore, the question becomes whether the sale was an "arm's-length" transaction. At the time of Plaintiff's purchase, the subject property was a bank-owned property. This court has addressed the issue of bank-owned property previously, observing that:

> "A property purchased through foreclosure may well involve an element of
> compulsion on the part of the seller. There are many practical reasons why the
> sale of a property following foreclosure by the lender might involve an atypical

---

[2] All references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2009.

market condition rendering the transaction of little or no value as an indication of market value. For example, the lender may have a policy of selling such property only for the amount of the underlying debt, regardless of what the property may actually be worth, particularly if it would take a few months more to find a buyer willing to pay a higher price. If so, the sale, at best, likely represents the low end of the real market value range, and may have been well below the actual market value of the property."

*Kryl v. Lane County Assessor* (*Kryl*), TC-MD No 100192B, WL 1197444 at *2 (March 30, 2011).

In *Kryl*, this court gave little weight to a bank-owned property sale which occurred within a few months after the bank acquired it and after a short listing period. This court has also observed that, "a sale of bank-owned property conducted with such rapidity suggests duress or compulsion on the part of the seller, leading the court to conclude such sales as not indicative of an arm's-length transaction." *Brashnyk*, WL 6182028 at *5.

Defendant's administrative rules specify that "[w]hen nontypical market conditions of sale are involved in a transaction (duress, death, foreclosures, interrelated corporations or persons, etc.) the transaction will not be used in the sales comparison approach unless market-based adjustments can be made for the nontypical market condition." OAR 150-308.205-(A)(2)(c).

The Oregon Supreme Court, in *Ward v. Dept. of Revenue*, recognized that property purchased through foreclosure may be considered "a voluntary *bona fide* arm's-length transaction between a knowledgeable and willing buyer and a willing seller." 293 Or 506, 508, 650 P2d 923 (1982). This court has also held that "[t]here are narrow exceptions determined on a case-by-case basis to the holding that bank-owned property sales are not typically representative of real market value." *Brashnyk*, WL 6182028 at *5. Such an exception may be recognized by the court "where the majority of sales are distress, [for] it would seem that that kind of sale would provide a more accurate reflection of the market." *Morrow Co. Grain Growers v. Dept. of Rev.*, 10 OTR 146, 148 (1985). Bank-owned property sales may be

considered as comparable sales for the purpose of establishing real market value "when those bank-owned property sales have been exposed to the open market and meet the nominal standards for an acceptable comparable sale." *Brashnyk*, WL 6182028 at *6 (internal quotation marks omitted).

The subject property was exposed to the market for 13 months total, and at the final listing price for less than two months. (Ptf's Ex 2 at 1; Def's Ex B at 1.) The average time similar properties were on the market was approximately 160 days. (Def's Exs F at 2; G at 2.) The subject property's prior owners reduced their listing price in response to pending foreclosure pressures. The bank sold the subject property in 51 days, a much shorter time period than the average days on the market. Both the prior owners' listing price reductions and the quick sale by the bank support the conclusion that the sale "suggests duress or compulsion on the part of the seller, leading the court to conclude such sales as not indicative of an arm's-length transaction." *Brashnyk*, WL 6182028 at *5. Plaintiff's purchase price of $420,000 is not singularly persuasive evidence in establishing the subject property's real market value.

B.    *Comparable sales approach*

Real market value is determined by the particular methods and procedures adopted by the Department of Revenue. ORS 308.205(2). There are three approaches to valuation (income, cost, and sales comparison) that must be considered when determining the real market value of a property. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995); *see also* OAR 150-308.205-(A)(2)(a) (stating that all three approaches must be considered, although all three approaches may not be applicable to the valuation of the subject property). The valuation approach to be used is a question of fact to be determined on the record. *Pacific Power & Light Co. v. Dept. of Rev.*, 286 Or 529, 533, 596 P2d 912 (1979).

Because the subject property is a residence and not an income producing property, the income approach is inapplicable. The cost approach was considered by Valasek but not used because he concluded that the age of the property made calculating depreciation difficult due to the fact that the subject property was "not new," and the comparable sales approach was more reliable given the "sufficient number of comparable sales * * * available." (Def's Ex A at 11.)

In a case such as the one before the court, the comparables sales approach may be used to value improved properties. *Chambers Management Corp v. Lane County Assessor*, TC-MD No 060354D, WL 1068455 at *3 (April 3, 2007) (citing Appraisal Institute, *The Appraisal of Real Estate* 335 (12th ed 2001)). Defendant adopted OAR 150-308.205-(A)(2)(c), stating that, "[i]n utilizing the sales comparison approach[,] only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."

As the party seeking affirmative relief, Plaintiff bears the burden of proving that the subject property's real market value is incorrect on the tax roll. ORS 305.427. Plaintiff must establish his claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.*, TC No 4530, WL 914208 at *2 (July 12, 2001) (citing *Feves v. Dept. of Rev.*, 4 OTR 302 (1971)); ORS 305.427. Plaintiff must present the greater weight of evidence to support his requested real market value reduction. This court has stated that "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (internal quotation marks omitted). "Competent evidence includes appraisal reports and sales adjusted for

time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD No 110300D, WL 879285 (March 13, 2012). Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.* (*Reed*), 310 Or 260, 265, 798 P2d 235 (1990).

"In evaluating the competing evidence, the court looks to the comparability of the different sales and the application of all necessary adjustments for differences. Adjustments are a key component in evaluating properties." *Voronaeff v. Crook County Assessor*, TC-MD No 110361C, WL 1426847 at *3 (April 25, 2012). According to *The Appraisal of Real Estate*:

> "Ideally, if all comparable properties are identical to the subject property, no adjustments will be required. However, this is rarely the case * * *. After researching and verifying transactional data and selecting the appropriate unit of comparison, the appraiser adjusts for any differences."

Appraisal Institute, *The Appraisal of Real Estate* 307 (13th ed 2008.)

In the case before the court, Plaintiff submitted an appraisal report, but the appraiser who prepared the report did not testify. Even though the court did not consider the appraisal report that Plaintiff submitted, adjusted comparable sales may also be helpful in determining real market value. Anderson submitted a list of comparable sales. (*See* Ptf's Ex 7.) However, Anderson's comparable sales approach was incomplete because the selected properties were not "adjusted to be comparable" to the subject property. OAR 150-308.205-(A)(2)(c). Anderson selected properties in the market area, however, the only criteria used in comparing the properties to the subject property were the year built, the neighborhood, and the unadjusted sale price. (Ptf's Exs 1 at 1; 7.) Anderson failed to adjust the selected comparable properties for size, quality, location, or other distinguishing features.

Plaintiff's evidence in support of his requested real market value reduction is inconclusive. When the "evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed*, 310 Or at 265. Unfortunately, Plaintiff has failed to carry his burden of proof.

Even though the burden of proof has not shifted to Defendant under ORS 305.427, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

Valasek submitted an appraisal for the subject property, supporting a roll value of $550,000. (*See* Def's Ex A.) Even though Valasek made adjustments to the comparable properties for time and closing costs that were adequately explained or supported, Valasek's adjustments for square footage, quality of construction, view, effective age, garage size, number of bathrooms, number of fireplaces, and other amenities were not adequately explained or supported. (Def's Ex A at 5-6, 10.) Valasek made no adjustment for the distance from the subject property to the comparable properties. Valasek testified that, "[t]o find similar properties to the subject property's size and quality, the generally accepted [one] mile radius was exceeded for several of the properties." (Def's Ex A at 10.)

The court finds that, with support for only two of the adjustments that Valasek made to his selected comparable properties, Valasek's evidence in support of his determined real market value is inconclusive. However, Defendant does not have the burden of proof.

Even though Plaintiff failed to carry his burden of proof and Defendant's evidence is inconclusive, the court will look to the market in an effort to determine the real market value of the subject property. The subject property was listed for sale for approximately 13 months. Valasek testified that the average market time for similar properties during 2010 was 160 days.

According to Valasek, real market value declined during this same time period at an annual rate of four percent. (*See id*.) From February 2010 until the prior owner lost the property in a foreclosure proceeding in June 2010, the subject property's prior owner reduced the listing price four times, resulting in a reduction of the listing price from $649,900 to $459,900. (Ptf's Ex 2 at 1.) During this time, no offers were accepted. (*Id*.) The average incremental price drop during those approximately four months was $47,500. (*Id*.) However, the largest price drop occurred in April 2010, resulting in a decrease from $649,900 to $549,900. (*Id*.) Subsequent price drops were smaller, with the last price drop in June 2010 being $20,000. (*Id*.) The subject property was a bank-owned property from June 2010 until the date of sale in March 2011. (*Id*.) The prior owner's final listing price of the property at $459,900 expired in June 2010 and the property was not offered for sale again until September 15, 2010, when the bank listed the subject property for $426,800. (*Id*.) The bank maintained this listing price for 51 days without reducing the price. (*Id*.) The bank received two additional pending offers before the property sold to Plaintiff on March 4, 2011, for $420,000. (*Id*.)

Within the short time, 51 days, that the subject property was offered at its final listing price of $426,800, the bank received three offers to purchase. Even though the prior owner exposed the subject property to the market for an adequate period of time, five months, the sellers received no offers. Given the three offers within 51 days, the court concludes that the subject property's sale by the bank was so rapid that duress or compulsion on the part of the seller resulted in a sale that was not arm's-length. Even though that sale was not arm's-length, it suggests that the subject property's real market value was no lower than Plaintiff's purchase price at that point in time. Plaintiff offered no evidence in support of his requested real market value as of January 1, 2011, other than his purchase price. The court does not agree that

Plaintiff's purchase price was the real market value of the subject property as of the assessment date. The market activity suggests that the subject property's real market value was more than Plaintiff's purchase price. Unfortunately, the court has no evidence to determine how much more. Defendant determined a real market value substantially in excess of the subject property's final offering price and Plaintiff's purchase price, supporting its conclusion of value with an appraisal report. Given the evidence before the court and Plaintiff's failure to carry his burden of proof, the court finds that the subject property's real market value was $550,000 as of the assessment date.

### III. CONCLUSION

After careful consideration of the testimony and evidence, the court concludes that Plaintiff failed to carry his burden of proof. The court accepts Defendant's determination that the real market roll value should be sustained. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2011-12 real market value of property identified as Account 01683093 was $550,000.

Dated this ____ day of July 2012.

_____
JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Presiding Magistrate Jill A. Tanner on July 31, 2012. The Court filed and entered this document on July 31, 2012.*